# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

PETER QUINN ELVIK,                    )
                                      )
                    Petitioner,       )        Case No.: 3:04-cv-00471-GMN-WGC
          vs.                         )
                                      )                **ORDER**
DON BUNCE, *et al.*,                  )
                                      )
                    Respondents.      )
_____)

    This action is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, by a Nevada state prisoner represented by counsel.  This matter comes before the Court on the merits of the second amended petition.

## I.    <u>FACTUAL BACKGROUND</u>

    In its order denying petitioner's direct appeal, the Nevada Supreme Court summarized the facts of this case in a published decision:

> At the time of the events leading to his conviction, the appellant, Peter Quinn Elvik, was fourteen years old and lived with his grandparents in Carson City, Nevada.  Until approximately one week before Elvik committed the charged offenses, he resided with his mother in Tustin, California, where he had a thirteen-year-old girlfriend.  Several hours before dawn on August 31, 1995, Elvik took a twelve-gauge shotgun from his grandparents' home and walked 14.7 miles to the Carson City Gun Range.  A sixty-two-year-old man named William Gibson arrived at the range shortly thereafter and commenced target shooting with a pistol.  Elvik shot Mr. Gibson several times with the twelve-gauge shotgun, took Mr. Gibson's pistol, and fled in Mr. Gibson's car. [Footnote 1: Elvik concedes that he shot Mr. Gibson, but claims that, after Elvik "made a statement about" Mr. Gibson's car keys, Mr. Gibson began to draw his pistol from its holster, causing Elvik to fire the shotgun in self-defense].  On the following day, police officers located Mr. Gibson's car in the parking lot of a motel in Costa Mesa, California. Elvik and his girlfriend were registered at the motel and fled when the police arrived.  Elvik's girlfriend was apprehended near the motel shortly thereafter, and Elvik was arrested near his mother's home on the following evening.

After his arrest, Elvik was taken to the Tustin Police Department, where Tustin police detectives interrogated him for two hours and twenty minutes. Elvik's mother was not present at the interrogation, and he did not yet have legal counsel. The detectives informed Elvik of his <u>Miranda</u> rights, and he agreed to speak with the detectives. [Footnote 2: <u>See</u> *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).] During the interrogation, Elvik repeatedly claimed that he did not remember being involved in the shooting because he was under the effects of a large dose of LSD at the time; however, near the end of the interrogation, Elvik discussed the shooting incident. Elvik was then booked into the Orange County Juvenile Hall. The following day, Elvik signed a written waiver of his <u>Miranda</u> rights and was interrogated by one of the Tustin detectives and two detectives from the Carson City Sheriff's Office for approximately ninety minutes.

A Nevada arrest warrant and criminal complaint were filed on September 4, 1995, and, on September 6, 1995, Elvik was charged with open murder with the use of a deadly weapon (Count I) and robbery with the use of a deadly weapon (Count II). Elvik was extradited to Carson City on September 14, 1995, and formally arraigned on September 15, 1995. Elvik was tried before a jury and, following a conviction on each count, the district court sentenced Elvik to a prison term of life with the possibility of parole for Count I, plus an identical term for a deadly weapon enhancement. For Count II, Elvik was sentenced to a term of 48 to 150 months, plus an identical term for a deadly weapon enhancement. All of the terms are to run consecutively.

Exhibit 109, at pp. 1-3; *Elvik v. State*, 114 Nev. 883, 965 P.2d 281 (Nev. 1998).[1]

## II.    PROCEDURAL HISTORY

On September 4, 1995, petitioner Elvik was charged by Criminal Complaint with one count of Open Murder With The Use Of A Deadly Weapon, a felony in violation of NRS 200.010, NRS 200.020, NRS 200.030, and NRS 193.165; and one count of Robbery With The Use Of A Deadly Weapon, in violation of NRS 200.380 and 193.165. (Exhibit 1).[2] On September 6, 1995, an Amended Criminal Complaint was filed in which the language of the

---

[1] The summary of background facts is intended only as an overview of the case, in order to provide context for the discussion of the issues. Any absence of mention of specific evidence in this overview does not signify that this Court has overlooked or ignored the evidence. The Court makes no credibility findings or other factual findings regarding the truth of the evidence or statements of fact in the state court. No statement of fact made in describing statements, testimony, or other evidence in the state court, whether in this overview or in the discussion of a particular issue, constitutes a finding of this Court.

[2] The exhibits referenced in this Order are found in the Court's record at ECF Nos. 11-20.

Criminal Complaint was amended. (Exhibit 2).  On September 27, 1995, a preliminary hearing was conducted after which petitioner was bound over to district court for arraignment on both counts of the amended criminal complaint. (Exhibit 6).  On October 9, 1995, a criminal information was filed charging petitioner with one count of open murder with the use of a deadly weapon, a felony in violation of NRS 200.010, NRS 200.020, NRS 200.030,and NRS 193.165; and one count of robbery with the use of a deadly weapon, a felony in violation of NRS 200.380 and NRS 193.165. (Exhibit 9).

A jury trial was conducted from October 21, 1996, through November 1, 1996. (Exhibits 42-70).  After presentation of the guilt phase of the trial, the jury found petitioner guilty of first-degree murder with the use of a deadly weapon and robbery with the use of a deadly weapon. (Exhibit 60).  After presentation of the penalty phase of the trial, the jury imposed a sentence of imprisonment for life with the possibility of parole. (Exhibit 66).

On December 9, 1996, petitioner was sentenced to a minimum of 48 months and a maximum of 150 months in prison for robbery and an additional 48 months minimum and maximum of 150 months in prison for use of a deadly weapon; the sentences to be served consecutive to each other and to the sentence for murder with the use of a deadly weapon. (Exhibit 75, at p. 17).

On December 10, 1996, a second amended judgment of conviction was entered in which petitioner was adjudged guilty of Count I, open murder with the use of a deadly weapon. Petitioner was sentenced to life imprisonment with the possibility of parole and a consecutive sentence of life with the possibility of parole for the use of a deadly weapon.  Petitioner was also adjudicated guilty of Count II, robbery with the use of a deadly weapon.  Petitioner was sentenced to a minimum of 48 months and a maximum of 150 months in prison for robbery, and a consecutive minimum 48 and maximum 150 months in prison for use of a deadly weapon. The sentence for Count II is to be served consecutive to the sentence for Count I. (Exhibit 78).

On January 8, 1997, petitioner appealed his conviction to the Nevada Supreme Court. (Exhibit 81).  On July 17, 1997, petitioner's attorney filed an opening brief. (Exhibit 96).  On September 2, 1998, the Nevada Supreme Court filed its opinion affirming the district court's judgment in its entirety. (Exhibit 109; reported at *Elvik v. State*, 114 Nev. 883, 965 P.2d 281(1998)).  Remittitur issued on September 22, 1998. (Exhibit 111).

On September 23, 1999, petitioner's counsel filed his state post-conviction petition for a writ of habeas corpus. (Exhibit 113).  On September 22 and 28, 2000, the state district court conducted an evidentiary hearing on petitioner's claims. (Exhibits 132-134).  On December 15, 2000, the district court issued its written order denying the petition. (Exhibit 135).

On January 19, 2001, petitioner filed his notice of appeal from the denial of his state habeas petition. (Exhibit 137).  On November 5, 2002, the Nevada Supreme Court issued its order affirming the district court's judgment. (Exhibit 176).  Remittitur issued on December 3, 2002. (Exhibit 178).

Petitioner's federal habeas petition was filed in this Court on August 31, 2004. (ECF No. 2).  Petitioner filed an amended petition on December 13, 2004. (ECF No. 8).  On February 10, 2005, this Court issued an order appointing counsel for petitioner. (ECF No. 22).  On June 23, 2006, the second amended petition was filed. (ECF No. 42).

Respondents moved to dismiss the second amended petition. (ECF No. 51).  On September 27, 2007, this Court dismissed the second amended habeas corpus petition as untimely. (ECF No. 60).  Judgment was entered the same date. (ECF No. 61).  Petitioner appealed. (ECF No. 60).

In an unpublished memorandum opinion, filed June 16, 2009, the Court of Appeals for the Ninth Circuit reversed this Court's dismissal of the petition. (ECF No. 65).  Specifically, the Court of Appeals held that petitioner is entitled to equitable tolling of the AEDPA statute of limitations, and remanded the action to this Court "to consider the merits of Elvik's petition for

habeas corpus." (ECF No. 65, at p. 3).  The Court of Appeals issued its mandate on August 4, 2009. (ECF No. 68).

On October 27, 2009, this Court directed respondents to answer the second amended petition. (ECF No. 70).  Respondents filed a motion to dismiss specific claims in the second amended petition. (ECF No. 75).  In the motion, respondents renewed certain arguments made in the previous motion to dismiss which were not considered by this Court. (*Id.*).

On January 4, 2011, this Court granted in part and denied in part respondents' motion to dismiss. (ECF No. 84).  The Court found that Grounds 3 and 4 of the second amended petition were unexhausted. (*Id.*).  Petitioner was given the option of returning to state court to exhaust Grounds 3and 4, or abandoning those unexhausted grounds. (*Id.*)  Petitioner elected to formally abandon Grounds 3 and 4 and proceed on the remaining claims in the second amended petition. (ECF No. 88).  This Court directed the filing of an answer and a reply. (ECF No. 90).  Respondents filed an answer on April 17, 2011. (ECF No. 91).  Petitioner, through counsel, filed a reply on July 19, 2011. (ECF No. 96).  The Court now addresses the remaining grounds of the second amended petition. (ECF No. 42).

## III.    FEDERAL HABEAS CORPUS STANDARDS

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), at 28 U.S.C. § 2254(d), provides the legal standard for the Court's consideration of this habeas petition:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693-694 (2002). A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000) and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer v. Andrade*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than merely incorrect or erroneous; the state court's application of clearly established federal law must be objectively unreasonable. *Id*. (quoting *Williams*, 529 U.S. at 409).

In determining whether a state court decision is contrary to, or an unreasonable application of federal law, this Court looks to the state courts' last reasoned decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000), *cert. denied*, 534 U.S. 944 (2001).

There is some question among circuit courts over how 2254(d)(1), 2254(d)(2), and 2254(e)(1) relate and interact with one another. *See Wilson v. Mazzuca*, 570 F.3d 490 (2d Cir. 2009); *Fairchild v. Workman*, 579 F.3d 1134 (10th Cir. 2009); *Childress v. Johnson*, 103 F.3d

1221 (5th Cir. 1997).  The Ninth Circuit has succinctly stated that 2254(d)(1) applies to "purely legal questions," 2254(d)(2) applies to "purely factual questions resolved by the state court," and 2254(e)(1) applies to "fact-based challenges founded on evidence raised for the first time in federal court." *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

Stated differently, the review of the state court's decision is an "intrinsic" review of the court's fact finding process, and is carried out under 2254(d)(2). *Taylor v. Maddox*, 366 F.3d 992, 999-1000(9th Cir. 2004).  If the state court survives this "intrinsic" review, then "the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenges based on extrinsic evidence, i.e., evidence presented for the first time in federal court." *Id*. Moreover, this new evidence will only work to overturn the state court's ruling "if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Id*.

In other words, 2254(e)(1) requires "clear and convincing evidence" showing that the new evidence warrants a reversal of the state court's ruling. *Id*. The Ninth Circuit has further stated that "factual findings not explicitly made, but nonetheless implicit in the state court's judgment" will be assumed to be correct under § 2254(e)(1) "unless clear and convincing evidence proves otherwise." *Goldyn v. Hayes*, 444 F.3d 1062, 1065 (9th Cir. 2006). The Supreme Court has stated the relationship this way:

> Miller-El may obtain relief only by showing the Texas conclusion to be an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' Thus we presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2003) (quoting 28 U.S.C. § 2254(d)(2); 28 U.S.C. § 2254(e)(1)).

///

IV.     **DISCUSSION**

    **A.   Ground One**

Petitioner asserts that: "The trial court erred in denying Mr. Elvik's motion to suppress his statements in violation of his Fifth, Sixth and Fourteenth Amendment constitutional rights because the statements Mr. Elvik made during two interrogations were obtained in violation of his constitutional rights and thus inadmissible." (ECF No. 42, at p. 14).  Each of petitioner's arguments are addressed below.

        1.     **Elvik knowingly waived his Miranda rights prior to both interviews with police – September 1, 1995 and September 2, 1995**

Petitioner argues that he did not knowingly waive his *Miranda* rights.  Under *Miranda*, a person in custody must be informed before interrogation that he or she has the right to remain silent and to have a lawyer present. *Miranda v. Arizona*, 384 U.S. 436 (1966).  A person may waive his or her *Miranda* rights provided that the waiver is knowing, intelligent, and voluntary. *Id.* at 479.  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception." *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  "Second, the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* at 573 (citing *Moran v. Burbine*, 475 U.S. at 421).  Courts look to the "totality of circumstances" in reviewing whether a waiver of *Miranda* rights was knowing, intelligent, and voluntary. *Miranda*, 384 U.S. at 475-477; *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Moran v. Burbine*, 475 U.S. at 421; *Colorado v. Spring*, 479 U.S. at 573.

The totality of the circumstances approach is the standard used for adults and juveniles in determining whether a *Miranda* waiver was knowing, intelligent, and voluntary. *Fare v. Michael C.*, 442 U.S. at 725.  In *Fare*, the Court considered whether a juvenile's waiver of *Miranda*

rights was knowing, intelligent, and voluntary, the Court ruled that such circumstances include "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. at 725; *see also Juan H. v. Allen*, 408 F.3d 1262, 1271-73 (9th Cir. 2005) (utilizing the totality of the circumstances test to find that a 15-year-old was apprised of his Miranda rights, understood his rights, and validly waived his *Miranda* rights). The test for reviewing a juvenile's waiver of rights and whether a confession is knowing, intelligent, and voluntary, is identical to that of an adult's and is based on "totality of the circumstances." *See U.S. v. Doe*, 155 F.3d 1070, 1073 (9th Cir. 1998) (quoting *Fare v. Michael C.*, 442 U.S. at 725).

However, because age is a factor considered among the totality of the circumstances, the approach will be the same as adults, but the result may be different. The Supreme Court and the Ninth Circuit have cautioned that courts must handle juveniles' rights with greater care than adults' rights. *See Application of Gault*, 387 U.S. 1, 55-56, 87 S. Ct. 1428, 1458, 18 L. Ed. 2d 527 (1976); *United States v. Doe*, 170 F.3d 1162, 1167 (9th Cir. 1999).

Petitioner appears to concede that he was given a partial *Miranda* warning by Detective Fate during the first interview, which occurred on September 1, 1995. However, petitioner argues that the colloquy that followed indicates that his waiver was unknowing, given his age (14 years of age) and his response ("Yea, I guess") when asked if he wanted to talk to the officers. In addressing this point, the Nevada Supreme Court found and held:

> Elvik first claims that he did not waive his <u>Miranda</u> rights because, after one of the officers recited the rights and asked Elvik if he wished to speak to the officers, Elvik replied "yea, I guess." Elvik insists that this reply was ambiguous, and did not constitute a formal waiver.
>
> We conclude that the language of Elvik's reply was sufficient to indicate his agreement to speak with the officers. Elvik's colloquial style of verbal expression throughout the interrogation was consistent with his reply, suggesting that his choice of words "yea, I guess," rather than "yes," was not indicative of an

unwillingness to speak to the officers. For example, the officer who read Elvik his Miranda rights stopped after each passage to ask Elvik if he understood, to which Elvik's replies were "ah huh," "yeah," "yeah," and "ah huh," respectively. (Exhibit 109, at pp. 7-8).

The Nevada Supreme Court's conclusion is supported by the record.  Just before the September 1, 1995 interview, petitioner and Detective Fate engaged in a colloquy in which petitioner responded with several statements of "yeah" and "ah huh" in response to Fate's statements and questions. (Exhibit 35A, at pp. 2-3).  The colloquy establishes that the *Miranda* warning provided to petitioner was adequate, that petitioner understood each of his rights, and that petitioner had heard the warnings on at least one other occasion. (*Id*.).  Contrary to petitioner's argument that Detective Fate attempted to minimize the *Miranda* warnings, the record shows that Detective Fate's statements were an effort to convey to petitioner the importance of the *Miranda* warnings. (*Id*.).

Petitioner further claims that he did not receive a proper *Miranda* warning prior to the second interview conducted on September 2, 1995, with Detectives King, Harper, and Strande of the Carson City Sheriff's Department.  At the beginning of the interview, petitioner was presented with a *Miranda* waiver form, acknowledged that he had read and understood the form, signed the form, and indicated that he was willing to speak with the Carson City detectives. (Exhibit 37, at pp. 122-23).  Detective King testified that he orally indicated to petitioner that he had the right to stop the interview at any time and the right to have an attorney present prior to starting the interview. (Exhibit 37, at p. 126).  The record establishes that petitioner knowingly waived his rights, for the second time, before the September 2, 1995 interview with Carson City detectives. (*Id*.).

This Court is aware that, at the time of the interviews, petitioner was 14 years old. (Exhibit 35C).  A psychological examination conducted shortly after the interviews found petitioner's intellectual functioning "within the above average to intellectually gifted range."

(Exhibit 35C at p.6).  The record indicates that petitioner had been read his *Miranda* rights on at least one prior encounter with law enforcement. (Exhibit 35D, at p. 3).  This Court finds that petitioner's age did not prevent him from knowingly waiving his *Miranda* rights at the interviews on September 1 and 2, 1995.

## 2.   Elvik's statements to police were voluntary

Petitioner contends that his statements to the police were not voluntary.  The Fifth Amendment privilege against self-incrimination and the Fourteenth Amendment Due Process Clause require that a confession be voluntary to be admitted into evidence. *Dickerson v. United States*, 530 U.S. 428, 433 (2000).  In determining whether an admission is voluntary, courts look to "whether a defendant's will was overborne" by looking at the "totality of circumstances." *Id*. at 434.  Voluntariness is assessed by considering "the totality of circumstances of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation." *Id*.  Even in the case of a juvenile, it is not enough that the police "indicate that a cooperative attitude would be to [the] benefit" of an accused unless such remarks rise to the level of "threatening or coercive." *Fare v. Michael C.*, 442 US. 707, 727 (1979).  There is no United States Supreme Court authority that requires a juvenile's parents to be notified or present before a juvenile can waive his rights and be interrogated. *See United States v. Doe*, 155 F.3d 1070, 1073 (9th Cir. 1998) (no right to parental notification).

### a.  Absence of Elvik's Mother During Interviews

Petitioner argues that his confession is involuntary because the detectives did not allow his mother to be present during the interviews with police.  The Nevada Supreme Court addressed this argument, as follows:

> Elvik next contends that the interrogating officers violated two requirements that apply only to the interrogation of juveniles.  Specifically, the officers did not allow Elvik's mother to be present during the interrogation, and did not advise him that his statements could be used in criminal court.  Elvik's mother was present at the police station during Elvik's interrogation, and signed a consent form to allow the

interrogation, but she was not allowed to be present during the interrogation.

When a defendant waives his <u>Miranda</u> rights and makes a statement during a custodial interrogation, the State bears the burden of proving voluntariness, based on the totality of circumstances. <u>Quiriconi v. State</u>, 96 Nev. 766, 772, 616 P.2d 1111, 1114 (1980).  Although Elvik provides no authority requiring the presence of a parent during the interrogation of a juvenile, we believe that, in light of Elvik's age, the absence of a parent during his interrogation should be considered in reviewing the totality of the circumstances bearing on the voluntariness of his statements. <u>See</u> <u>People v. Lara</u>, 432 F.2d 202 (Cal. 1967) (age and presence of parent are factors in determining voluntariness).

(Exhibit 109, at p. 8).  The Nevada Supreme Court correctly held that a parent does not have to be present during an interrogation for a confession to be voluntary. *Derrick v. Peterson*, 924 F.2d 813, 819 (9th Cir. 1990); *United States v. Doe*, 219 F.3d 1009, 1017 (9th Cir. 2000). However, "the totality approach permits—indeed, mandates—inquiry into all the circumstances surrounding the interrogation." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Furthermore, "holding that a parent or guardian's presence is not required, however, is not the same as saying they do not have the right to participate.  In fact, this Court, the Supreme Court, and the Seventh Circuit have specifically suggested that children need parental involvement during interrogation." *United States v. Doe*, 219 F.3d 1009, 1017 (9th Cir. 2000) (internal quotations omitted).

Therefore, Elvik's mother did not have to be present during the interrogation for Elvik's confession to be voluntary, but her involvement generally is to be considered among the totality of the circumstances. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979).  Aligning with the case law above, the Court finds that the police officers obtaining written permission from petitioner's mother prior to both interrogations, (Exhibit 37, at pp.42, 120; Exhibit 35E), and petitioner being told that his mother was present at the police station during his interview with Detective Fate (Exhibit 35A, at p. 1), were sufficient to satisfy Elvik's mother's right to be involved in the interrogation.  Also, these circumstances are among several of the factors to be considered

within the totality of the circumstances.  Weighing all relevant factors together, Elvik's mother's absence during the interrogation does not tip the scales to a lack of voluntariness in Elvik's confession.  Thus, applying federal law, i.e. considering the totality of circumstances, the absence of petitioner's mother during the interview did not render his confessions involuntary in violation of clearly established federal law, as determined by the United States Supreme Court.

### b.  Scope and Criminal Nature of Interviews

Petitioner argues that he was deliberately misled regarding the reason he was being interviewed.  Petitioner cites Detective Fate's comments that "the reason you were arrested is because of what happened in Costa Mesa" and "we need to discuss some things about the guns and stuff like that." (ECF No. 42, at p. 15).  These comments do not explicitly refer to the murder investigation, but they cannot be characterized as false.  At the time of the interview with Detective Fate, petitioner was in custody on suspicion of having stolen a vehicle found in the parking lot of a motel in Costa Mesa, California. (Exhibit 37, at p. 63).  A shotgun had been left in the stolen vehicle, and Detective Fate's reference to the "guns" provided some indication of his intent to question Elvik about the shooting. (Exhibit 35A, at pp. 2-3).  Petitioner indicated at the outset of the interview that he understood the detectives wanted to talk to him about the shooting by saying: "I just know that Stephen told me that I shot somebody in Nevada or something and stole his car." (Exhibit 35A, at p.1).  Petitioner understood that the detectives intended to question him about the shooting and Detective Fate's reference to the incident in Costa Mesa did not make petitioner's subsequent confession involuntary.

Petitioner also argues that his statements to police were involuntary because the interviewing officers did not inform him that his statements could be used against him in adult criminal court.  The Nevada Supreme Court addressed this argument, as follows:

> The interrogating officers failed to inform Elvik that his statements could be used against him in an adult trial in criminal court.

> Clearly, neither police officers nor juvenile authorities should be allowed to mislead a youth in order to obtain a confession.  A juvenile should be advised of his rights and informed of the possibility of an adult trial.  But where the nature of the charges and the identity of the interrogator reflect the existence of an unquestionably adversary police atmosphere and the suspect is reasonably mature and sophisticated with regard to the nature of the process, resulting statements will be admissible in a criminal trial provided that the record otherwise supports a finding of voluntariness.

Quiriconi, 96 Nev. at 771, 616 P.2d at 114 (citation omitted).  Although Elvik was not informed of the possibility of an adult trial, he knew that he was being questioned by police investigators who wished to discuss the shooting incident, and the interrogation took place at a police station.  Hence, the nature of the charges and the identity of the interrogator reflected the existence of an "unquestionably adversary police atmosphere."  We further note that Elvik was reasonably mature and sophisticated with regard to the nature of the process, as he is of above average intelligence and had been arrested on at least one previous occasion.  Accordingly, we conclude that the interrogating officers' failure to explain to Elvik that statements could be used against him in an adult trial in criminal court is not alone sufficient to render Elvik's statements inadmissible.

(Exhibit 109, at pp. 8-9).

Petitioner does not dispute that Detective Fate told him that any statements he made during the interview could be used against him in court. (See Exhibit 35A, at p. 2).  However, petitioner argues that his confession was involuntary because he was not "informed that his statements could be used not only in juvenile court, but in any criminal court." (ECF No. 24, at p. 15).  Petitioner points to Detective Fate's apparent belief that petitioner would be processed or sentenced as a juvenile and Detective Fate's related comments at the conclusion of the interview. (Id.).  At the conclusion of the interview on September 1, 1995, and after petitioner had confessed to the shooting, he and Detective Fate discussed what would happen next:

> PETER: Am I going to juvenile hall here, or in Nevada?
>
> FATE: You'll be going to juvenile . . . juvenile hall, here, and they have to get a warrant for your arrest, before they can take you to Nevada.  And then you'll be going to Nevada to stand trial.

PETER: (Inaudible) after I return to court, then I'm going to be going there, staying there, in Nevada?

FATE: Yeah, that's where the crime occurred.   That's where you go to court (inaudible).   You know, there's different juvenile laws.   Maybe they can switch it down to here, I don't know.   Maybe they can switch the sentencing, so you're down here, I don't know.   But, ah, all I want you to know is I hope things work out and you get things straightened out in your life because you aren't helping anybody, at this point.   In fact, you're hurting people.   Okay?

END OF INTERVIEW.

(Exhibit 35A, at p. 56).   However, this exchange occurred after petitioner admitted to the shooting and Detective Fate's comments therefore had no effect on the voluntariness of petitioner's confession during the first interview.   These circumstances, considered in conjunction with the adversary police atmosphere of the interview, petitioner's relative maturity, petitioner's previous encounter with police, and the detectives' warning to petitioner that his statements could be used against him in court, demonstrate that petitioner understood he could face serious consequences if convicted of the killing.   The detectives' failure to specifically inform petitioner that he could later be charged with murder in an adult criminal proceeding does not render his confession involuntary. *See Colorado v. Spring*, 479 U.S. 564 (1987) (failure to inform defendant of subject matter of interrogation could not have affected his decision to waive *Miranda* rights).

### c.   Coercion

Petitioner argues that his statements were coerced.   The Nevada Supreme Court considered the argument, as follows:

Finally, Elvik argues that his statements were not voluntary because the interrogation was coercive.   A confession is inadmissible unless freely and voluntarily given, <u>Rowbottom v. State</u>, 105 Nev. 472, 482,779 P.2d 934, 940 (1989), and "[i]n order to be voluntary, a confession must be the product of a 'rational intellect and a free will.'" <u>Passama v. State</u>, 103 Nev. 212, 213-14, 735 P.2d 321, 322 (1987) (quoting <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960)). In determining whether a confession is the product of a free will, this court

employs a "totality of the circumstances test" to determine "whether the defendant's will was overborne when he confessed." Passama, 103 Nev. at 214, 735 P.2d at 323; see also Schneckloth v. Bustamonte, 412 U.S. 218 (1973). However, "a confession obtained by physical intimidation or psychological pressure is inadmissible." Thompson v. State, 108 Nev. 749, 753, 838 P.2d 452, 455 (1992) (citations omitted).

The officers did not threaten Elvik during the interrogation, and Elvik does not allege any specific instance of physical or psychological intimidation.  False promises or misleading statements also do not appear to be an issue, as the officers indicated that they could not promise Elvik lenient treatment if he agreed to talk about the shooting incident.  Although the officers did not intimidate or mislead Elvik, Elvik argues that the officers applied prolonged psychological pressure, to which he was particularly vulnerable at the time.

Throughout the interrogation, Elvik claimed that he did not remember shooting Mr. Gibson.  Despite Elvik's insistence, the officers repeatedly stated that Elvik did remember, and attempted to persuade Elvik to discuss the incident.  The officers appealed to Elvik's conscience, suggested that his girlfriend and his mother would want him to tell the truth, and told him that things would be better for him in the future if he would tell the truth.  Elvik raises numerous examples of the coercive pressure he claims to have been under during the interrogation; however, a line by line discussion of the interrogation would not facilitate our analysis.

The United States Supreme Court, in Gallegos v. Colorado, 370 U.S.49, 54 (1962), recognized that juveniles are more susceptible than adults to high pressure interviewing tactics when a parent or attorney is not present:

> [A] 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police.  That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests or how to get the benefits of his constitutional rights . . . .

> . . . A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not.

We conclude that the investigators' tactics did not involve physical or psychological intimidation and, therefore, were not alone coercive.  Despite this conclusion, we also acknowledge that the totality of circumstances attendant to the interrogation were such as to create a close question concerning the voluntariness of Elvik's inculpatory statements.

(Exhibit 109, at pp. 10-11).  The Nevada Supreme Court went on to conclude that petitioner's statements were voluntary. (*Id*. at pp. 11-12).

Consistent with the Nevada Supreme Court's finding, petitioner does not allege that he was physically coerced or threatened during the interrogations. (ECF No. 42, at pp. 14-18).  Rather, he claims that his confession was coerced through misrepresentation, promises of leniency, appeals to his conscience, and fatigue. (*Id*.).  Petitioner points to statements made by Detective Fate which he interprets as misleading or promising leniency if he were to confess.  However, the record shows that at the beginning of petitioner's interview, Detective Fate explicitly stated that he and Detective Harper could not offer petitioner any promises. (Exhibit 35A, at p. 3).  Prior to petitioner's admission that he shot the victim, Detective Fate clarified in the following verbal exchange any misperception that petitioner might have had with respect to how confessing might improve his situation:

> PETER: So if I tell you, doesn't mean I'm like off the hook.
>
> FATE: No, you're not off the hook whether you talk to us . . . you're not going to be off the hook.  You're right, you aren't. But that's not what we're talking about.  Whether you're off the hook with the law or not.
>
> PETER: Well, that's what your saying.
>
> FATE: No, I'm not.  I'm talking about you being off the hook with yourself.

(Exhibit 35A, at pp. 39-40).  Given this colloquy, petitioner had no reason to believe that he had been promised leniency in exchange for his confession.

Petitioner further alleges that his confession was coerced based on statements Detective Fate made appealing to his conscience and his feelings for his girlfriend. (ECF No. 42, at p. 6).  While respondents concede that, because they did not believe petitioner's initial assertions, the detectives made repeated attempts to persuade him to acknowledge his role in the shooting. (*See* Exhibit 35A).  Petitioner's assertion fails, because "this type of psychological encouragement

does not equate with coercion or necessarily interfere with the exercise of free will." *See State v. Davis*, 780 P.2d 807 (Or. App. 1989).

Petitioner asserts that his confession was not voluntary because "he testified that he had very little sleep" prior to the interview with Detective Fate. (ECF No. 42, at p. 17). This Court finds it significant that, at no time during the interview did petitioner say he was tired. (Exhibit 35A; Exhibit 37, at pp. 49-50). The interview began between 9 p.m. and 10 p.m. (Exhibit 37, at p. 45), and lasted approximately two and a half hours (*Id*. at p. 47). These circumstances strongly suggest that fatigue was not a factor in the voluntariness of Elvik's confession. The detectives in the instant case did not use the type of tactics typically associated with coercion. *See, e.g.*, *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (police withheld food and prevented sleep during an 18-hour interrogation); *Beecher v. Alabama*, 389 U.S. 35 (1967) (police officers held gun to the head of wounded individual to extract confession); *Davis v. North Carolina*, 384 U.S. 737 (1966) (police placed individual in closed cell without windows, provided limited food, and used coercive tactics for 16 days).

### d. Totality of Circumstances

When reviewing whether a confession is involuntary, the applicable test requires consideration of "the totality of all the surrounding circumstances." *Dickerson*, 530 U.S. at 434; *see also Fare v. Michael C.*, 442 U.S. at 725; *Moran v. Burbine*, 475 U.S. at 421; *Colorado v. Spring*, 479 U.S. at 573. Upon consideration of the totality of circumstances, the Nevada Supreme Court affirmed the state district court's ruling that the confessions given by petitioner at both interviews were voluntary:

> The fact that Elvik did not have his mother or an attorney present, coupled with Elvik's youth and the officers' persistent refusal to accept Elvik's claimed failure to remember the shooting, cast some doubt on the voluntariness of Elvik's statements. However, Elvik's intelligence and experience with the criminal justice system also bear on the voluntariness of his statements. "The [district court's] decision regarding voluntariness is final unless such finding is plainly untenable." <u>Boggs v. State</u>, 95 Nev. 911, 913-14, 604 P.2d 107, 109 (1979). Both the district

court and the jury determined that Elvik's statements were made voluntarily and, although competing factors create a close question in this case, we conclude that the district court's finding was not plainly untenable.

Elvik next contends that his statements made at the second interrogation, which occurred on the day following his arrest, were also inadmissible.  Elvik argues that the second interrogation was tainted by the impropriety of the first interrogation, and that the officers who conducted the second interrogation also failed to inform Elvik that he could face criminal charges and be tried as an adult.  Based on our analysis of the first interrogation, we conclude that the district court's finding that Elvik's statements at the second interrogation were voluntary was not plainly untenable.

(Exhibit 109, at pp. 11-12).

In considering the totality of circumstances to analyze the voluntariness of petitioner's confessions, the Nevada Supreme Court applied the correct constitutional rule.  In addition to those circumstances identified by the Nevada Supreme Court that weighed in favor of finding petitioner's confessions voluntary, he received *Miranda* warnings and waived his rights prior to each interview; the length of the interviews were relatively short; petitioner was not suffering from fatigue at the time of the interviews; and the detectives obtained written permission from petitioner's mother prior to the interviews, despite not being constitutionally required to do so.

In light of the totality of the facts, there is no indication that petitioner's express waiver of his rights under *Miranda* was not knowing, voluntary, and intelligent, or that the state court acted objectively unreasonably in concluding that the petitioner was apprised of his *Miranda* rights, that he understood those rights, and that he validly waived those rights.  Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.

As the Nevada Supreme Court noted, Elvik's youth and the officers' persistence are facts that may point to a lack of voluntariness.  However, as the Nevada Supreme Court also points out, Elvik was of above average intelligence, and he had prior experience with law enforcement.

Furthermore, his mother's involvement in the interrogation, i.e., her presence at the police station and her signing of the waiver form, cuts the other way and shows voluntariness on the part of Elvik.  The Nevada Supreme Court itself called the question "close" and this Court cannot disagree with that assessment.  Therefore, because facts exist that point to both voluntariness and involuntariness, a ruling either way would not be based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Accordingly, this Court concludes that the state court's ruling was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  **This Court DENIES habeas relief on Ground One of the petition.**

### B.   Ground Two

Petitioner asserts that: "The trial court abused its discretion when it shackled Mr. Elvik in the absence of a hearing in the presence of the jury and in the absence of cautionary instructions, in violation of his Fifth, Sixth and Fourteenth Amendment right to due process, confrontation and a fair trial by an impartial jury." (ECF No. 42, at p. 18).

"The Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by the state interest specific to a particular trial . . . [such as] security problems and risk of escape at trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  This prohibition applies to both the guilt phase and penalty phase of trial. *Id*. at 633.

The Nevada Supreme Court addressed petitioner's claim regarding the shackling during the guilt phase of the trial, as follows:

> Elvik claims that he was physically restrained in the jury's presence during the guilt and penalty phase of his trial, in violation of his constitutional rights.  A defendant's rights are violated when he is made to appear before a jury in shackles during the guilt phase of a trial, and "when such error has occurred, it is our duty to reverse a conviction <u>unless it is clear that the defendant was not prejudiced thereby</u>." <u>Grooms v. State</u>, 96 Nev. 142, 144, 605 P.2d 1145, 1146 (1980) (citations omitted) (emphasis added).   However, constitutional protection is

diminished during the penalty phase because the defendant is no longer entitled to a presumption of innocence. See Canape v. State, 109 Nev. 864, 872, 859 P.2d 1023, 1028 (1993).  A defendant may be shackled at sentencing, but "only when used as a last resort to protect an essential state interest – such as maintaining public safety or assuring the decorum of the proceedings." Duckett v. Godinez, 67 F.3d 734, 737 (9th Cir. 1955).

As an initial matter, the parties disagree about whether Elvik was shackled for the entire duration of the trial, or only during the penalty phase.  This distinction is important, because, although the United States Court of Appeals for the Ninth Circuit applies the same standard to both the guilt and penalty phases of a trial, see Duckett, 67 F.3d at 748, this court in Grooms set forth a rule against shackling during the guilt phase in the absence of exceptional circumstances. Grooms, 96 Nev. at 144, 605 P.2d at 1146.

As evidence that he was shackled during the guilt phase of his trial, Elvik offers only a portion of the guilt phase trial transcript in which the parties discussed, outside the presence of the jury, the State's request to have Elvik step down from the witness stand to participate in a reenactment of the shooting incident.  The court stated: "Mr. Elvik has got to be taken out of restraints and put out there. And I'll let you do this, but you will do it – when you're done with that, I won't have him wandering around again."

Although the district court did use the term "restraints" in reference to Elvik, we also note that Elvik's counsel did not object to Elvik's alleged restraint during the guilt phase, and offers no other evidence that Elvik was restrained at this time. Elvik discusses the rules for penalty phase shackling in his opening brief, and does not discuss the evidence that he was shackled during the guilt phase until his reply brief.  Accordingly, the State had no opportunity to address Elvik's contention with specificity.

In light of the paucity of evidence on this issue, we are particularly mindful of the State's motion to strike selected portions of Elvik's opening brief, which included affidavits from the court bailiff and a deputy sheriff who were present at Elvik's trial.  The bailiff and the deputy sheriff, who supervised Elvik as he entered and exited the courthouse, each signed a sworn affidavit stating that Elvik was not shackled or otherwise restrained while in the courthouse during the guilt phase of his trial.  Based on these affidavits, Elvik's counsel's failure to object to the alleged guilt phase shackling, and the lack of clear evidence supporting Elvik's allegation, we believe that the district court's reference merely reflected an error or a poor choice of words, and that Elvik was not shackled during the guilt phase of his trial.

(Exhibit 109, at pp. 3-5).

The issue of whether Elvik's Fifth, Sixth, or Fourteenth Amendment rights were violated is an issue that falls under the scope of § 2254(d)(2) because it is a purely factual question that was resolved by the state court.  Therefore, the Nevada Supreme Court's finding of fact that petitioner was not in shackles during the guilt phase of the trial is to be upheld unless it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Applying that standard, the Court finds that the Nevada Supreme Court's finding that petitioner was not placed in restraints during the trial's guilt phase was not an unreasonable determination of facts in light of the facts presented.

Petitioner argues that he was improperly shackled during the penalty phase. (ECF No. 42, at p. 19).  There is no citation to the record to support this assertion.  Even assuming that petitioner was shackled during the penalty phase, the record indicates that the state district judge determined in his discretion that petitioner presented a security risk based on information suggesting that he had planned an escape during sentencing. (Exhibit 70, at p. 70).  Therefore, shackling was permissible as a matter of due process to ensure the safety of those in the courthouse and to prevent petitioner from escaping.  As such, the Nevada Supreme Court's adjudication of the shackling issue did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. 2254(d).

Petitioner further contends that his Fifth, Sixth, and Fourteenth constitutional rights were violated when: (1) the state district judge allowed an armed guard to stand near him during the reenactment of the shooting incident; (2) the judge stationed armed security guards in the courthouse during sentencing; and (3) the judge failed to provide a cautionary instruction to the jury regarding the security guards. (ECF No. 42, at pp. 18-19).

The Supreme Court has stated that a person is found guilty or not guilty based upon the

evidence presented at trial and not based on any outside influence or suspicion. *Holbrook v. Flynn*, 475 U.S. 560, 576 (1986).  However, "this does not mean that every practice tending to single out the accused from everyone else in the courtroom must be struck down." *Id*.  Speaking of armed guards specifically, "reason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial." *Id*. at 569.  Rather, whether the presence of security guards within a courtroom is prejudicial is to be determined on a case-by-case basis. *Id*. There is no case law that states that a judge is required to read a cautionary jury instruction regarding security guards. However, when the trial judge "assiduously works to impress jurors with the need to presume the defendant's innocence," then it can be "trusted that a fair result can be obtained." *Id*. at 567. Therefore, as long as a judge does impress upon jurors the defendant's presumed innocence, then there is no constitutional violation, with or without a cautionary jury instruction.

The Court finds that petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. The presence of an armed security guard is not inherently prejudicial; therefore, the Nevada trial court allowing them to be present was not per se an unreasonable application of federal law.  There may be times when the presence of armed security guards is unconstitutionally prejudicial to the defendant, but when placed "at some distance from the accused" it is more likely that the jurors will believe them to be a part of the court's own security more generally and not necessarily there because of "defendant's special status." *Flynn*, 475 U.S. at 569.  The Court finds that in this case, because the guards were placed "at some distance" from the accused, and because the trial court judge did, in fact, offer a cautionary instruction to the jury, Elvik was not unconstitutionally prejudiced by the presence of armed security guards.  **Therefore, this Court DENIES habeas relief on Ground Two of the petition.**

1

### C.   Ground Five

2

Petitioner alleges: "The trial court erred in denying Mr. Elvik's motion to suppress his

3

statements due to the failure to bring him before a magistrate in a timely manner in violation of

4

his Fourth Amendment constitutional rights." (ECF No. 42, at p. 23).  Petitioner was held in

5

custody without bail in Orange County, California from the time of his arrest on September 1,

6

1995, until his extradition to Carson City, Nevada on September 14, 1995.  Petitioner was

7

arraigned on September 15, 1995. (Exhibit 7).

8

Petitioner's claim is barred by *Stone v. Powell*, 428 U.S. 465, 482 (1976), which

9

precludes Fourth Amendment claims in federal habeas actions where the petitioner had a "full

10

and fair" opportunity to litigate the claim in state court.  Nevada provides an opportunity to

11

litigate such claims by statute.  *See* NRS 179.085.  The record shows that petitioner received a

12

full and fair hearing in the state courts on this issue, in particular, when petitioner fully briefed

13

the issue to the Nevada Supreme Court. (Exhibit 96).  The Nevada Supreme Court denied relief

14

on petitioner's Fourth Amendment claim. (Exhibit 109 at pp. 14-15).  Ground Five is therefore

15

barred by *Stone v. Powell*.

16

Petitioner relies on *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991) to support

17

the argument that petitioner's Fourth Amendment rights were violated.  In *McLaughlin*,

18

arrestees brought a class action lawsuit under 42 U.S.C. § 1983, alleging that the county violated

19

the Fourth Amendment by failing to provide prompt judicial determinations of probable cause to

20

persons arrested without a warrant. 500 U.S. at 47-48.  The Court held that if the probable cause

21

determination does not occur within 48 hours, the government has the burden of demonstrating

22

the existence of a bona fide emergency or other extraordinary circumstance. *Id*. at 57.  Nothing

23

in *McLaughlin* casts doubt on the validity of the *Stone v. Powell* bar to Fourth Amendment

24

claims in federal habeas. *See Anderson v. Calderon*, 232 F.3d 1053, 1068 (9th Cir. 2000) (noting

25

that claims based on the *McLaughlin* rule are barred by *Stone v. Powell* where petitioner had an

opportunity to litigate the claim in state court), *overruled on other grounds by Osband v. Woodford*, 290 F.3d 1036, 1043 (9th Cir. 2009).  **This Court DENIES habeas relief on Ground Five of the petition.**

### D.    Ground Six

Petitioner alleges that: "The trial court erred in admitting evidence of Mr. Elvik's incriminating statements through his girlfriend's testimony.  As a result, Mr. Elvik's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated." (ECF No.42, at p. 25).  Petitioner claims that his rights were violated when the court admitted testimony of his girlfriend to the effect that petitioner had stated that he wanted "to rob a store and get some money, to get a car so he could come back home," and "shoot the police and leave in the car we had come in." (ECF No. 42, at p. 25) (quoting trial transcript).  The trial court permitted this testimony "based on its determination that the statements were 'admissible to show that [Elvik] act[ed] in either motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident under NRS 48.045.'" (Exhibit 109, at p. 16).  Petitioner alleges that the testimony resulted in the denial of a fair trial guaranteed by due process.

Federal habeas relief is generally not available to review questions about the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  The Ninth Circuit has held that, on habeas review, federal courts may not interfere with a state evidentiary ruling, but may only consider whether the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. *Fuller v. Roe*, 182 F.3d 699, 703 (9th Cir. 1999); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (1993).  Federal courts "are not a state supreme court of errors; [they] do not review questions of state evidence law.  On federal habeas [the courts] may only consider whether the petitioner's conviction violated constitutional norms." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.

1991) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).

The Nevada Supreme Court denied this claim, finding that petitioner's statements, presented in his girlfriend's testimony, were admissible as a party admission to prove intent, plan, motive, or design. (Exhibit 109 at 16-17).  The Court found that petitioner's statements were relevant, as "they bear on the plausibility of Elvik's claim that he did not intend to kill Mr. Gibson for the purpose of stealing his automobile, but, rather, shot Mr. Gibson because he believed that Mr. Gibson was drawing a handgun for the purpose of shooting Elvik." (*Id*., at p. 17).  The Nevada Supreme Court affirmed the state district court's determination that the prejudicial effect of the statements did not outweigh their probative value. *Id*.

The Court finds that the admission of the testimony was not in violation of his Fifth, Sixth, or Fourteenth amendment rights.  Like NRS 48.045, the Federal Rules of Evidence 404(b)(1) and (2) provides that evidence of other crimes, wrongs, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "this evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

Although Elvik's girlfriend's testimony may speak prejudicially to his character, as understood under 404(b)(1), the testimony also works to show intent as understood under 404(b)(2); therefore, the admission of the testimony was not a violation of Elvik's Fifth, Sixth, or Fourteenth amendment rights.  Based on the same reasoning, petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  **This Court DENIES habeas relief on Ground Six of the petition.**

### E.   Ground Seven

Petitioner asserts: "The reasonable doubt instruction given during Mr. Elvik's trial improperly minimized the State's burden of proof.  As a result, Mr. Elvik's conviction and sentence are invalid under the federal constitutional guarantees of due process under the Fifth and Fourteenth Amendments to the United States Constitution." (ECF No. 42, at p. 26).  The reasonable doubt instruction given at petitioner's trial is as follows:

> A reasonable doubt is one based on reason.  It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life.  If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt.  Doubt to be reasonable must be actual, not mere possibility or speculation.

(Exhibit 57, Instruction No. 16).

To obtain federal habeas relief based on an improper jury instruction, petitioner must establish that the instruction so infected the entire trial that the resulting conviction violates due process. *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  In reviewing jury instructions, the court inquires as to whether the instructions as a whole were misleading or inadequate to guide the jury's deliberation. *U.S. v. Garcia-Rivera*, 353 F.3d 788, 791 (9th Cir. 2003) (citing *United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) (internal citations omitted)).  An instruction may not be judged in isolation, "but must be considered in the context of the instructions as a whole and the trial record." *Id*.  Jurors are presumed to follow the instructions that they are given. *U.S. v. Olano*, 507 U.S. 725, 740 (1993).  Even if instructional error is found, habeas relief will not lie unless the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 144-47 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

In the instant case, petitioner asserts that the "govern and control" language of the

instruction inverts the proof and doubt standards, impermissibly raising the level of doubt needed to acquit and lowering the burden of proof to convict.  Petitioner does not cite any legal authority to support his assertion that the instruction violates due process.

The Nevada Supreme Court rejected petitioner's argument, citing the Nevada state decision *Lord v. State*, 107 Nev. 28, 806 P.2d 548 (1991) (court upheld constitutionality of reasonable doubt instruction virtually identical to the one at issue in the instant case). (Exhibit 109, at pp. 18-19).  Moreover, the Ninth Circuit has held that the "govern and control" language does not violate due process. *Ramirez v. Hatcher*, 136 F.3d 1209, 1214 (9th Cir. 1998); *see also Nevius v. McDaniel*, 218 F.3d 940, 945 (9th Cir. 2000) (finding challenge to Nevada's reasonable doubt instruction unworthy of certificate of appealability).  Petitioner has failed to establish that Instruction 16 so infected the entire trial that the resulting conviction violates due process.  Petitioner has failed to meet his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  **This Court DENIES habeas relief on Ground Seven of the petition.**

### F.   Ground Eight

Petitioner asserts as follows: "The trial court erred in refusing to issue Mr. Elvik's proposed jury instruction [on] knowledge of wrongfulness.  As a result, Mr. Elvik's conviction and sentence are invalid under the federal constitutional guarantees of due process under the Fifth and Fourteenth Amendments to the United States Constitution." (ECF No. 42, at p. 27).  The instruction on knowledge of wrongfulness at issue in Ground 8 states:

> All persons are liable to punishment except those belonging to the following class as it applies to this case:
>
> Children between the ages of eight and fourteen years, in the absence of clear proof that at the time of committing the act charged against them they knew its wrongfulness.  Peter Elvik was fourteen years old on August 31, 1995.

(Exhibit 58, at p. 2).  Petitioner asserts that the state district court's refusal to issue this instruction violated due process because "Mr. Elvik had the right to present the jurisdictional prerequisite as part of the proof of the requisite mens rea and a theory of defense under the Fifth and Fourteenth Amendments to the United States Constitution." (ECF 42, at p. 27).

The Nevada Supreme Court addressed only petitioner's second argument and ruled as follows:

> Although Elvik's proposed instruction fairly restates the provisions of NRS 194.010, we conclude that, based on the facts of this case, the district court did not err in refusing to issue the instruction.  A district court need not instruct the jury on principles that are redundant with or rendered nugatory by other issues before the jury, or that do not bear on the disposition of the case.  Elvik's defense rested on a claim that Elvik believed that he was defending himself.  The jury had to reject Elvik's claim of self-defense in order to convict him of murder.  Elvik offered no affirmative defense of insanity, and did not otherwise put his capacity to discriminate between right and wrong at issue.  Hence, under the circumstances and arguments of the case, the jury's rejection of the self-defense claim and determination that Elvik was guilty of murder beyond a reasonable doubt implicitly involved a conclusion that clear proof established that Elvik knew the wrongfulness of his actions.
>
> Even if the district court erred in refusing to issue Elvik's jury instruction, we conclude that any error was harmless.  The aforementioned evidence of Elvik's plan to commit a robbery in order to procure an automobile, attempts to evade police officers after the crime, and evasive answers to the officers' questions constitute clear proof that Elvik understood the wrongfulness of his actions.  See Poole v. State, 97 Nev. 175, 625 P.2d 1163 (1981) (thirteen-year-old's attempt to hide murder weapon and fabrication of alibi constituted sufficient knowledge of wrongfulness under NRS 194.010).

(Exhibit 109, at p. 20).

Analyzing Elvik's Eighth claim for relief, the Court finds that the lower courts' rulings were "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  The Court finds this to be true in terms of the state trial court's initial decision not to give the instruction,

as well as the Nevada Supreme Court's determination that the trial court's conclusion was not error, or if it was error, then it was harmless error. (Exhibit 109, at p. 20).

"When a party properly objects to a jury instruction, we review *de novo* whether the instructions given 'accurately describe the elements of the charged crime.' " *United States v. Munguia,* 704 F.3d 596, 598 (9th Cir.2012) (quoting *United States v. Heredia,* 483 F.3d 913, 921 (9th Cir.2007) (en banc)).  When an element of a crime is stated incorrectly or omitted in the jury instructions, then the court reviews for harmless error. *United States v. Liu*, 731 F.3d 982, 987 (9th Cir. 2013).

"An improper jury instruction does not require reversal if the error is harmless." *U.S. v. Garcia*, 729 F.3d 1171, 1177 (9th Cir. 2013).  However, "[a]n error in a jury instruction describing an element of the offense is harmless only if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)) (internal quotation marks omitted).  For example, in *U.S. v. Garcia*, the jury instruction error was not considered harmless where, in a murder trial, the jury instruction for involuntary manslaughter failed to define gross negligence. *Id.* at 1172.  Accordingly, the court found that the "jury instruction allowed the jury to convict [the defendant] without finding an essential element." *Id.*  Similarly, in a copyright infringement case, the Ninth Circuit found the error was not harmless when a trial court instructed the jury to apply a civil liability standard of general intent when specific intent was actually required for a criminal conviction. *Liu*, 731 F.3d at 991-2.

The Nevada Supreme Court correctly cited the principle that trial courts need not give jury instructions which are redundant with or rendered nugatory by other issues before the jury, or that do not bear on the disposition of the case.  However, by focusing only on the application of the instruction as part of the self-defense affirmative defense theory, the Nevada Supreme Court failed to address its presumptive application – creating an additional element of the

offense.  In finding that the verdict of guilty implied that the jury had concluded clear proof established that Elvik knew the wrongfulness of his actions, the court noted that the jury rejected the self-defense theory and "Elvik offered no affirmative defense of insanity, and did not otherwise put his capacity to discriminate between right and wrong at issue."  This analysis, however, constituted impermissible burden-shifting because it is the prosecutor who must prove that the eight-to fourteen-year-old child understood the wrongfulness; it is not an affirmative defense.

Diminished capacity is an affirmative defense for adults who *are presumed* to understand the wrongfulness of their actions.  However, for children between the ages of eight and fourteen, the presumption pursuant to Nevada law is that they do not understand the wrongfulness of their actions. Nev. Rev. Stat. 194.010.  As such, this statute is not an affirmative defense for children, but rather Nev. Rev. Stat. 194.010 is a rebuttable presumption.  Prior Nevada Supreme Court decisions have interpreted this statute consistently in this manner.  In *Winnerford v. State*, the Nevada Supreme Court reversed Winnerford's conviction (adjudication) "on the ground that the State failed to rebut the presumption that Winnerford did not have the legal capacity to commit sexual assault."112 Nev. 520, 523, 915 P.2d 291, 293 (1996).  The *Winnerford* court cited to the same statute at issue here, Nev. Rev. Stat. 194.010 and the same subsection (2) regarding children between the ages of eight and fourteen. Nev. Rev. Stat. 194.010(2).  *Id.*  Even the dissent in *Winnerford* categorized the statute as a rebuttable presumption of incapacity. *Id.* at 527, 295.

Both dissenting justices disagreed with the court's determination – extending the application of the statute to a juvenile delinquency adjudication; however, the dissent agreed that the statute was enacted as a rebuttable presumption for use in adult courts to clarify the common law.  The dissent explained the history of the statute as follows:

> This statute was clearly enacted to define when a person may be convicted of a crime in the adult courts and to clarify the common law. The common law and

statutory law regarding eligibility for criminal conviction has varied over the years. Under the early common law, children of any age could be held criminally responsible.  Later, the common law rule held that children under the age of seven were conclusively presumed to be without criminal capacity, but there was a *rebuttable presumption* of incapacity for children from age seven to thirteen and children over thirteen were held fully responsible.  Most states have adopted statutes that reflect these concepts, although the age of capacity has varied. NRS 194.010 was clearly designed to address these principles of criminal liability for children.

*Id.* (emphasis added).

As such, according to Nevada law, the requested instruction is not an affirmative defense for which the defendant would bear the burden of establishing diminished capacity.  Rather, this statute creates an additional element that must be proven by the prosecution for each and every criminal offense alleged to have been committed in Nevada by a child between the ages of eight and fourteen.

At the time the murder was committed, Elvik was fourteen years old.  His age alone is sufficient evidence to require the instruction be given.  The instruction has a foundation supported by the evidence because Elvik was fourteen years old, and the Court finds that not giving the instruction was contrary to clearly established federal law.[3]

Whether "clear proof" was offered at trial rebutting the presumption was a question for the jury.  "Jurors are required to apply the law as it is explained to them in the instructions they are given by the trial judge." *Escobar de Bright*, 742 F.2d at 1201.  The mere existence of evidence which could reasonably amount to "clear proof" of his understanding of the wrongfulness does not mean that the jury actually found Elvik to have understood wrongfulness

---

[3] Nevada law is not at odds with federal law on this issue.  In fact, Nevada law states "a party has the right to have the jury instructed on all theories of the party's case that are supported by the evidence if the instructions are correct statements of the law." *J.A. Jones Constr. Co. v. Lehrer McGovern Bovis, Inc.*, 120 Nev. 277, 284-85, 89 P.3d 1009, 1014 (2004).

without the proper jury instruction.

Further troubling is the Nevada Supreme Court's determination that if the jury rejected the self-defense claim and determined petitioner to be guilty of murder, then "implicitly" the jury concluded that petitioner knew the wrongfulness of his actions. (Exhibit 109, at p. 20.) However, without the instruction informing the jury that a minor under age 15 is presumed to not be able to understand the wrongfulness of his actions, a verdict of guilty of murder would actually be far easier to reach.  The presumption for a child aged 14 or younger that he does not understand the wrongfulness creates an additional element for the prosecutor to prove with clear proof.  The jury's rejection of a self-defense claim and a determination of guilt does not automatically mean that the jury found "clear proof" that petitioner knew of the wrongfulness of his actions.  This Court agrees with Petitioner that "failure to give this instruction relieved the State of its duty to prove an element of the offense(s)…" (ECF No. 42 at 28, ll. 1-2).

The Nevada Supreme Court also stated that even if failure to give the instruction was in fact error, it was harmless error and therefore of no consequence. When assessing harmless error, in a § 2254 proceeding, the harmless error must be analyzed under the *Brecht* test or under the *Chapman*/AEDPA test. *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011).  As there is still some question over which test should be applied, the Court will look at the issue under both tests. *Id*. at 458.

Under *Brecht*, "habeas relief is warranted only if the error had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 113 S. Ct. 1710, 123 L.Ed.2d 353 (1993)).  Also, if the question is so evenly balanced that a judge feels in virtual equipoise as to the harmlessness of the error and has grave doubt about whether an error affected a jury substantially and injuriously, the judge must treat the error as if it did so. *Merolillo*, 663 F.3d at 454.  Furthermore, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred

are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579 (1986).

The Court finds that under *Brecht* the error of not giving the jury instruction was not harmless error.  Given petitioner's age, the prosecutor needed to show "clear proof" rebutting the assumption *against* understanding.  As it is extremely likely that a reasonable juror would question whether a child actually had the capacity to understand what he was truly doing when taking a man's life, the failure to instruct the jury on the applicable law creates grave doubts about their verdict.  The Court concludes the error substantially and injuriously affected the jury.

The Nevada Supreme Court reasoned that the error was harmless because Elvik showed the capacity to understand the wrongfulness of his actions through other actions committed in carrying forth the crime for which he is imprisoned.  The Nevada Supreme Court referenced his intent to commit robbery, attempts to evade police, and evasive answers to law enforcement as evidence of his capacity to understand the wrongfulness of his actions.  However, this Court finds that the age of petitioner and the duty to properly instruct the jury on the law which should guide their deliberative process warranted giving the jury instruction so that the jury could decide if they believed unanimously that the state had met its burden.

The answers provided by Elvik to the police are an example of his failure to understand his action.  He often answered their queries with "ah huh." (Exhibit 109, at pp 7-8.)  Also, he asked law enforcement whether he would be going to juvenile detention in California or Nevada, thereby showing a lack of understanding of the gravity of the actions he committed. (Exhibit 35A, at p. 56.)  Although the Nevada Supreme Court is correct that his other actions could reasonably be found by a jury to amount to clear proof of his understanding of the wrongfulness of his actions, whether the jury would have done so if it were properly instructed is doubtful.  This is ultimately a factual question within the exclusive province of the jury.  The failure to provide the instruction to the jury regarding the applicable law substantially and injuriously affected the jury.  The question should have been left to the jury and not doing so

leaves the Court in grave doubt over whether the error substantially and injuriously affected the jury and so it must be treated as if it did so.

Under *Chapman*/AEDPA test, before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967). The error is harmless if it did not "contribute to the verdict obtained." *Id*.

The Court finds, using the same reasoning applied to the *Brecht* standard, the error was also not harmless under the *Chapman*/AEDPA test. The Court does have a reasonable doubt that the error was harmless and that the error did contribute to the verdict obtained because it lowered the burden for the prosecution, and thereby may have affected the outcome of the case. When an element such as this, directly affecting the liability of a criminal defendant, has not been clearly proven through the proper jury instructions, it undermines the confidence of society in the verdict which is returned. The Court cannot say beyond a reasonable doubt that the error was harmless.

Petitioner has met his burden of proving that the Nevada Supreme Court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Additionally, the Court finds that the failure to give the requested jury instruction amounted to error that was harmful and affected the outcome of the verdict against petitioner. **Accordingly, habeas relief is GRANTED on Ground Eight of the petition.**

### G.   Ground Nine

Petitioner claims that his due process rights under the Fifth and Fourteenth Amendments were violated due to cumulative error. (ECF 42, at p. 28).

The Nevada Supreme Court rejected petitioner's cumulative error claim on direct appeal. "Based upon our aforementioned conclusions regarding Elvik's claims of error, the cumulative

effect of any such error clearly was not sufficient to deprive Elvik of his right to a fair trial." (Exhibit 109, at p. 22).

To the extent that cumulative error may be grounds for federal habeas relief, the Ninth Circuit has announced that: "[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). This Court has reviewed the state court record and the pleadings filed by the parties. Petitioner has not demonstrated that cumulative errors occurred, and even assuming errors did occur, that such errors resulted in a trial that was fundamentally unfair. **As such, this Court DENIES habeas relief with respect to Ground Nine of the petition.**

### H.   Ground Ten

Petitioner claims that his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments was violated based on five alleged instances of deficient attorney performance. (ECF No. 42, at pp. 28-37).

#### 1.    Standard for Ineffective Assistance of Counsel Claims

Ineffective assistance of counsel claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that a petitioner claiming ineffective assistance of counsel has the burden of demonstrating that (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense. *Williams v. Taylor*, 529 U.S. 362, 390-391 (2000) (citing *Strickland*, 466 U.S. at 687). To establish ineffectiveness, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Id*. To establish prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id*. Additionally, any review of the attorney's

performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.  It is the petitioner's burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *Id*.

Ineffective assistance of counsel under *Strickland* requires a showing of deficient performance of counsel resulting in prejudice, "with performance being measured against an 'objective standard of reasonableness,'. . . 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quotations omitted).  If the state court has already rejected an ineffective assistance claim, a federal habeas court may only grant relief if that decision was contrary to, or an unreasonable application of the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme court's decision on a claim of ineffective assistance of counsel as "doubly deferential." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411, 1413 (2009)).  The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's performance . . . . through the "deferential lens of § 2254(d).'" *Id*. at 1403 (internal citations omitted).  Moreover, federal habeas review of an ineffective assistance of counsel claim is limited to the record before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S.Ct. at 1398-1401.

## 2.     Ground 10(A)

In Part A of Ground 10, petitioner claims that his trial counsel was ineffective for failing to adequately investigate petitioner's drug use on the night of the shooting incident. (ECF No. 42, at p.28).  Petitioner testified at the state post-conviction hearing that he was on LSD the night he left his grandparent's home and walked to the shooting range. (Exhibit 132, at pp. 147-

48).

Petitioner's trial counsel, Scott Freeman, testified at the post-conviction hearing that petitioner "specifically told me that he didn't use LSD" on the night of the shooting, and that petitioner said that he told the detectives he used LSD during the interview "because he didn't want to talk to them anymore." (Exhibit 132, at p. 235). Petitioner's statement to Freeman is corroborated by James Jackson[4], who testified at the post-conviction hearing that "Peter [petitioner] told me that the only thing he had ever really done was marijuana." (Exhibit 133, at p. 74). Trial counsel also reviewed the blood test conducted on petitioner that indicated there was no LSD present in his body. (Exhibit 37, at pp. 10-12).

The state court record indicates that trial counsel's decision not to present evidence of petitioner's alleged drug use was sound trial strategy. In denying petitioner's ineffective assistance of counsel claim, the state district court found and held:

> Even had he been under the influence of L.S.D., and the facts belie this, defense counsel stated that he would not want to introduce such evidence before the Court. First, it would show a young man with some sophistication in drug activity. Second, that influence, according to counsel, was not a complete defense to the mental state necessary for murder in Nevada. Defense counsel wanted to portray the Defendant as a young man who was frightened and scared, and shot when he was frightened into doing so. He did not want any inference from L.S.D. use that Elvik was, in fact, a deliberately intoxicated individual who brought this on himself through drug-induced activity.

(Exhibit 135, at pp. 10-11). On appeal from the denial of his state post-conviction habeas petition, the Nevada Supreme Court rejected petitioner's claim of ineffective assistance of counsel, as follows: "We conclude that trial counsel's exclusion of the facts relating to Elvik's purported drug use was a valid trial tactic that is not subject to retrospective attack." (Exhibit 176, at p. 2).

---

[4] Nevada Public Defenders James Jackson and Diane Crow originally undertook representation of petitioner when he was arrested in California on Nevada charges. They traveled to California and interviewed petitioner, and briefly represented him in Nevada, before private trial counsel, Scott Freeman, was retained. (Exhibit 135, at pp. 3-4).

The Court finds that, in light of the facts presented, trial counsel's inquiry into petitioner's drug use does not amount to ineffective assistance of counsel.  Petitioner confessed to trial counsel that he had not used LSD on the night of the incident, and confessed that he had not done so previously. (Exhibit 132, at p. 235.)  Also, as stated above, the drug test showed petitioner was not on LSD when he committed the murder. (Exhibit 37, at pp. 10-12.)  Knowing those facts, there was no reason for trial counsel to inquire further into the matter; and, more importantly, no duty under the Sixth Amendment to do so.  In this case, any defense based on drug use would have been meritless, and counsel has no duty to raise non-meritorious arguments. *Shah v. United States*, 878 F.2d 1156, 1162 (9th Cir. 1989).  Thus, trial counsel was not ineffective when he did not inquire further into petitioner's drug use.

Petitioner has failed to meet his burden of proving that the state court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. **Habeas relief is DENIED on Ground 10(A) of the petition.**

### 3.   Ground 10(B)

Petitioner claims that trial counsel was ineffective for failing to present, during the guilt phase of trial, psychological evidence relating to the voluntariness of petitioner's confession and state of mind at the time of the killing. (ECF No. 42, at p. 30-33).  Petitioner asserts that this evidence should have been presented through the testimony of Dr. Daniel Dugan, a Nevada certified psychiatrist.  Petitioner's counsel attempted, unsuccessfully, to introduce Dr. Dugan's testimony at trial regarding the voluntariness of the confession, and petitioner argues that counsel unreasonably failed to present legal authority supporting the admissibility of such testimony. (*Id.*).  Petitioner suggests that there were two cases, which, if presented to the trial court, would have led to the admissibility of Dr. Dugan's testimony: *In Re Anthony J*, 86

Cal.App.3d 164 (1978) and *People v. Breaux*, 1 Cal.4th 281, 821 P.2d 585 (Cal. 1991). (ECF No. 42, at p. 32).

Petitioner's trial counsel called Dr. Dugan during the guilt phase of the trial and attempted to introduce testimony regarding the voluntariness of petitioner's confession. (Exhibit 37, at pp. 202-213).  At the state post-conviction hearing, counsel testified that he had conducted a thorough search for case law that would support admitting expert testimony on coerced confessions. (Exhibit 132, at p. 232).  Counsel determined that there was no such authority. (*Id.*).

In light of the deference given to counsel when reviewing ineffective assistance of counsel claims, especially in a petition for habeas relief, the Court finds that counsel's decision to not offer Dr. Dugan's testimony did not amount to ineffective assistance of counsel.  It is not required that trial counsel's performance be the "best practice or most common custom. *Stokley v. Ryan*, 659 F.3d 802, 811-12 (9th Cir. 2011).  It is simply required that counsel's assistance not amount to "incompetence under prevailing professional norms." *Id*.  The Court finds that trial counsel's research into the matter met that standard.

Trial counsel perhaps could have offered *In Re Anthony J.* and *People v. Breaux* to advance his argument of Dr. Dugan testifying, because where Nevada law is lacking California law is borrowed. *Commercial Standard Ins. v. Tab Constr. Inc.*, 94 Nev. 536, 538 P.2d 449, 451 (Nev. 1978).  However, as stated above, best practice or most common custom is not required, which looking to California law when Nevada law is silent would be.  Therefore, trial counsel's failure to look to California law cannot be called ineffective assistance of counsel in this case.

Furthermore, both California cases are distinguishable from the case at bar and would not have helped petitioner's case.  Counsel has no duty to raise arguments that are meritless. *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance").  Therefore, trial counsel was not ineffective when he did not

offer the trial court *In Re Anthony J.* and *People v. Breaux* to support the admission of Dr.

Dugan's testimony.

Regarding the allegation that trial counsel was ineffective for failing to present

psychological evidence relating to petitioner's state of mind at the time of the killing during the

guilt phase, the state district court found the following when denying petitioner's state post-

conviction habeas petition:

> Here, Mr. Freeman [petitioner's trial counsel] was afraid that if there was a
> discussion of the Defendant's mental state, the State of Nevada would clearly
> establish that Elvik had no serious mental condition which negated criminal
> responsibility.  Rather, the evidence could be used by the State to establish that
> Elvik was very anti-social and dangerous, and the killing of the victim was without
> remorse.  These facts would seriously damage the defense which counsel intended
> to pursue.

(Exhibit 135, at p. 9).  As such, counsel reasonably decided not to present Dr. Dugan's

testimony regarding petitioner's state of mind at the time of the killing, because it would open

the door to evidence that would be adverse to the defense.  Trial counsel's decision can be seen

as a tactical choice and not a choice or a mistake that made his assistance ineffective.  The

Nevada Supreme Court affirmed the state district court's ruling on this point. (Exhibit 176, at p.

2).  Petitioner has failed to meet his burden of proving that the state court's ruling was contrary

to, or involved an unreasonable application of, clearly established federal law, as determined by

the United States Supreme Court, or that the ruling was based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding.  **Habeas relief is**

**DENIED on Ground 10(B) of the petition.**

### 4.    Ground 10(C)

Petitioner claims that his trial counsel was ineffective for failing to call petitioner's

mother, Brenda Kaycee Howell, at the suppression hearing. (ECF No. 42, at pp. 34-35).

Petitioner asserts that his mother would have testified that "psychological tactics were used on

her by the police to obtain her permission to question Mr. Elvik" and that this testimony would have altered the outcome of the trial. (*Id.*, at p. 35).

The state court record indicates that counsel's decision not to call petitioner's mother (Ms. Howell) at the suppression hearing was a strategic choice. Counsel presented testimony regarding the alleged psychological tactics used by police in obtaining permission from Ms. Howell to question petitioner through the testimony of Charles Congdon, Ms. Howell's boyfriend, who had accompanied her to the police station. (Exhibit 37, at pp. 152-56). Mr. Congdon's testimony is substantively identical to the testimony that petitioner now asserts should have been presented. (*Id.*).

Since the boyfriend of petitioner's mother testified about the same issue that petitioner's mother would have testified about, the Court cannot say that the choice amounted to ineffective assistance of counsel. Not raising the issue at all may have risen to the level of ineffective assistance, but choosing one person over another to testify, especially when the testimony of each would have been effectively the same, cannot be called ineffective assistance of counsel. Rather, the Nevada Supreme Court was correct in concluding that trial counsel's choice was a tactical decision and not one that violated petitioner's right to effective assistance of counsel. (Exhibit 176, at pp. 2-3.)

Therefore, petitioner has failed to meet his burden of proving that the state court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. **This Court DENIES habeas relief on Ground 10(C) of the petition.**

### 5.   Ground 10(D)

Petitioner alleges that his trial counsel was ineffective for failing to object to the shackling of petitioner during the trial phase of trial. (ECF No. 42, at pp. 35-36). As previously

discussed, the state court record indicates that petitioner was not shackled during the guilt phase of trial. (Exhibit109, at pp. 3-5). Counsel was not ineffective for failing to object to a circumstance that did not exist. Petitioner has shown neither deficient performance of counsel, nor prejudice. **This Court DENIES habeas relief on Ground 10(D) of the petition.**

### 6.    Ground 10(E)

Petitioner asserts that: "Instead of pursuing a defense that could have mitigated the offense to possible second degree murder or manslaughter, defense counsel chose to pursue a self-defense theory." (ECF No. 42, at p. 36). Petitioner claims that his trial counsel was ineffective for failing to pursue a defense theory based on petitioner's state of mind and his lack of knowledge of wrongfulness. (*Id*.). Petitioner asserts that such a theory would have been preferable to the self-defense theory presented at trial.

The state court record shows that trial counsel made a strategic choice to pursue a self-defense theory and not a theory based on petitioner's knowledge of wrongfulness. Trial counsel testified at the evidentiary hearing on the post-conviction petition that his decision not to use a diminished capacity defense and go into petitioner's state of mind at the time of the killing was strategic. He also testified that his use of the self-defense theory was "tactical/strategic." In denying this claim in the state post-conviction petition, the state district court ruled:

> During the trial, Mr. Freeman [petitioner's trial counsel] was always well-prepared. He had a strong understanding of the facts and the law in this case. He had a clear understanding of the tactics and strategies he intended to use at trial. Indeed, in hindsight, he chose the only possible defense which might have prevailed in this case. He worked diligently to present a defense that his client was an anxious, scared, nervous young man who tried to talk the victim into giving him the keys, and then panicked and shot him when the victim pulled his pistol on Elvik. Mr. Freeman wisely limited evidence which would work against this defense. For example, once again, evidence of the use of drugs would lessen the scared, nervous and anxious qualities by making them self-inflicted by an illegal drug. Likewise, his psychological evidence if used would only serve to paint the picture of Elvik as a cold-blooded sociopathic killer with absolutely no remorse. Mr. Freeman successfully walked a very carefully prescribed path in his representation of Elvik, and did it with remarkable success.

(Exhibit 135, at p. 14).  As such, the Court finds counsel's decision to pursue a theory of self-defense rather than a theory of petitioner's lack of knowledge of wrongfulness was a reasonable choice.  "A reasonable tactical choice based on an adequate inquiry is immune from attack under *Strickland*. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997).  The Court finds that trial counsel's choice to pursue a self-defense theory over a knowledge of wrongfulness theory was a reasonable tactical choice.  The Nevada Supreme Court affirmed the state district court's rejection of this claim. (Exhibit 176, at p. 3).

Petitioner has failed to meet his burden of proving that the state court's ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or that the ruling was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  **This Court DENIES habeas relief on Ground 10(E) of the petition.**

V.    **CONCLUSION**

**IT IS THEREFORE ORDERED** that the Second Amended Petition for a Writ of Habeas Corpus is **DENIED with respect to Grounds One, Two, Five, Six, Seven, Nine, and Ten**.

**IT IS FURTHER ORDERED** that the Second Amended Petition for a Writ of Habeas Corpus is **CONDITIONALLY GRANTED with respect to Ground Eight.**

**IT IS FURTHER ORDERED that** the state court Judgment of Conviction is hereby **VACATED** and petitioner shall be released from custody within thirty (30) days of the later of the conclusion of any proceedings seeking appellate or certiorari review of the Court's judgment, if affirmed, or the expiration of the periods for seeking such appeal or review, unless the State files in this matter a written notice of election to retry petitioner within the thirty-day period to retry petitioner and thereafter commences jury selection in the re-trial within one hundred twenty (120) days following the filing of the notice of election to retry petitioner,

subject to request for reasonable modification of the time periods in the judgment by either party pursuant to Rules 59 or 60 of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter final judgment accordingly in favor of petitioner and against respondents, conditionally granting the Second Amended Petition for a Writ of Habeas Corpus as provided above.

**IT FURTHER IS ORDERED** that a **Certificate of Appealability is GRANTED as to the Court's denial of Grounds One, Two, Five, Six, Seven, Nine, and Ten** of the Second Amended Petition for a Writ of Habeas Corpus.

**IT IS FURTHER ORDERED** that the Clerk of Court shall provide a copy of this Order and the Judgment to the Clerk of the First Judicial District Court for the State of Nevada, and to the District Attorney of Carson City in connection with Case No. 95-001799C.  The Clerk of Court shall also provide a copy of this Order and Judgment to the Clerk of the Nevada Supreme Court, in connection with that court's Case No. 29830.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly.

**DATED** this 4th day of December, 2013.

_____
Gloria M. Navarro
United States District Judge